NAEUN RIM (CA Bar #263558)
KISHAN H. BAROT (CA Bar #281829)
NORO MEJLUMYAN (CA Bar #324145)
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA  90067
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224
E-mail:  NRim@manatt.com
E-mail:  KBarot@manatt.com
E-mail:  Nmejlumyan@manatt.com

*Attorneys for*
First Idea International LTD

THOMAS WATSON (CA Bar #181546)
ROBERT MOCKLER (CA Bar #200200)
ALEXANDER AVERY (CA Bar #307390)
STEPTOE & JOHNSON LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
T: (213) 439-9400
F: (213) 439-9599
twatson@steptoe.com
rmockler@steptoe.com
aavery@steptoe.com

*Attorneys for*
Applicant Patokh Chodiev

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE EX PARTE APPLICATION OF PATOKH CHODIEV FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 | Case No.  2:22-MC-00250-JAK-AFM<br><br>**[DISCOVERY MATTER]**<br><br>**JOINT STIPULATION RE FIRST IDEA INTERNATIONAL LTD'S MOTION TO QUASH SUBPOENAS ISSUED PURSUANT TO APPLICANT PATOKH CHODIEV'S *EX PARTE* APPLICATION FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782 OR, IN THE ALTERNATIVE, MOTION FOR A PROTECTIVE ORDER, AND REQUEST FOR SANCTIONS**<br><br>Date:  June 6, 2023<br>Time:  10:00 a.m.<br>Place:  Temple St., Ctrm #780, 7th Fl.<br><br>**Honorable Alexander F. MacKinnon**<br><br>Discovery Fact Cut-Off:  None<br>Final Pretrial Conference:  None<br>Jury Trial:  None |

MANATT, PHELPS &
PHILLIPS, LLP

# TABLE OF CONTENTS

**Page**

I.  FIRST IDEA'S ARGUMENT ................................................................. 7

   A.  INTRODUCTION ......................................................................... 7

   B.  STATEMENT OF FACTS ........................................................... 10

      1.  First Idea and Its Founder Jonathan Gray ................................. 10

      2.  ERG Enlists First Idea's Help Cultivating Business Relationships with Prominent Figures in Saudi Arabia .......... 10

      3.  At ERG's Recommendation, First Idea Tries Refinitiv's World-Check Platform for a Due Diligence Report on ERG ................................................................................... 12

      4.  Chodiev Files an Ex Parte Application Containing Defamatory Allegations Against First Idea, Which Is Published In the Media ....................................................... 13

      5.  First Idea's Extensive Efforts to Resolve the Dispute ............. 16

   C.  ARGUMENT ............................................................................... 20

      1.  The Court Should Quash the Subpoenas for Being Sought in Bad Faith, or Alternatively Use Its Inherent Authority to Strike the Unsupported Allegations from the Application ............................................................................. 20

         a.  Chodiev's Application contains false accusations that were made in bad faith because they lacked evidentiary support ................................................... 23

         b.  The Application also omits material facts regarding the relationship between ERG and First Idea ............... 26

      2.  The Court Should Impose Sanctions by Awarding Attorneys' Fees to Deter Chodiev From Making Unsupported Damaging Assertions and Omissions in Court Filings in the Future ....................................................... 27

      3.  The Court Should Alternatively Grant a Protective Order That Significantly Limits the Scope of the Overbroad Subpoena Topics That Have Nothing to Do With Refinitiv .............................................................................. 30

      4.  Should the Court Require Compliance With the Subpoenas, the Court Should Award First Idea Reasonable Attorneys' Fees and Costs For the Undue Burden of Such Compliance Under Rule 45 ............................ 36

   D.  CONCLUSION ........................................................................... 37

II. CHODIEV'S ARGUMENT ............................................................... 37

   I.  INTRODUCTION ....................................................................... 37

   II.  FACTUAL BACKGROUND ...................................................... 39

      A.  Refinitiv Improperly Includes Mr. Chodiev in World-Check ................................................................................. 39

**TABLE OF CONTENTS**
(continued)

| | | | | Page |
|---|---|---|---|---|
| | B. | Mr. Chodiev Applies for Discovery from First Idea | | 41 |
| | C. | The Court Orders the Discovery from First Idea | | 42 |
| | D. | First Idea Refuses to Comply With the Subpoena | | 43 |
| III. | ARGUMENT | | | 44 |
| | A. | The Court Correctly Granted the Section 1782 Application | | 44 |
| | B. | The Application Was Not Brought in "Bad Faith." | | 46 |
| | | 1. | Any Relationship Between ERG, First Idea and the Saudis Was Unknown to Mr. Chodiev and Is Irrelevant. | 46 |
| | | 2. | The Application Is Not "Defamatory" | 47 |
| | | 3. | There Is No Basis for the Motion to Strike. | 49 |
| | | 4. | First Idea's Shifting Version of Events Undermines Their Assertions. | 49 |
| | C. | The Subpoena Topics Seek Relevant Information and Are Not Overbroad. | | 50 |
| | D. | Sanctions Are Not Appropriate Here. | | 52 |
| IV. | CONCLUSION. | | | 54 |

JOINT STIPULATION RE FIRST IDEA'S
MOTION TO QUASH SUBPOENAS ISSUED
BY APPLICANT PATOKH CHODIEV

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allstate Ins. Co. v. Tacoma Therapy, Inc.*
  No. 13-CV-05214-RBL, 2014 WL 1494100 (W.D. Wash., Apr. 16, 2014)......30

*Baxalta Inc. v. Genentech, Inc.*,
  No. 16-MC-80087-EDL, 2016 WL 11529803 (N.D. Cal. Aug. 9, 2016)..........34

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ....................................................................................27, 52

*Dews v. Kern Radiology Med. Grp., Inc.*,
  No. 1:12–cv–00242–AWI–MJS (PC), 2013 WL 1284110 (E.D. Cal. Mar.
  28, 2013)...................................................................................................23, 49

*F.J. Hanshaw Enterprises, Inc. v. Emerald River Dev., Inc.*,
  244 F.3d 1128 (9th Cir. 2001) ............................................................................27

*Fink v. Gomez*,
  239 F.3d 989 (9th Cir. 2001).............................................................................28

*Forsher v. Bugliosi*,
  26 Cal. 3d 792 (1980)........................................................................................15

*Green Dev. Corp. S.A. De C.V. v. Zamora*,
  No. 15-21594-MC, 2016 WL 2745844 (S.D. Fla. May 10, 2016)..............21, 25

*In re Abud Valech*,
  No. 20-MC-23408-WPD, 2021 WL 1062228 (S.D. Fla. Mar. 18, 2021)..........25

*In re Bernal*,
  No. 18-21951-MC, 2018 WL 6620085 (S.D. Fla. Dec. 18, 2018) ....................33

*In re Dep't of Antioquia*,
  No. 16-CV-20335, 2016 WL 10707020 (S.D. Fla. June 9, 2016) .....................22

*In re Ex Parte Applic. Of TPK Touch Sols. (Xiamen) Inc.*,
  Case No. 16-mc-80193-DMR, 2016 WL 6804600 (N.D. Cal. Nov. 17,
  2016)..................................................................................................................44

*In re Ex Parte Application of Qualcomm Inc.*,
  162 F. Supp. 3d 1029 (N.D. Cal. 2016...................................................32, 42, 44

*In re: Ex Parte Application Varian Med. Sys. Int'l AG*,
  No. 16-MC-80048-MEJ, 2016 WL 1161568 (N.D. Cal., Mar. 24, 2016) ...20, 34

JOINT STIPULATION RE FIRST IDEA'S
MOTION TO QUASH SUBPOENAS ISSUED
BY APPLICANT PATOKH CHODIEV

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Hedrick House Ltd.*,
   Case No. SA MC20-00005-Doc (DFM), 2020 WL 3965999 (C.D. Cal.
   Mar. 31, 2020) .................................................................................................... 44

*In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*,
   539 F.2d 1216 (9th Cir. 1976) ........................................................................... 20

*In re Oasis Focus Fund LP*,
   No. 3:22-MC-0112-BGS, 2022 WL 17669119 (S.D. Cal. Dec. 14, 2022)........ 25

*In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*,
   634 F.3d 557 (9th Cir. 2011) ....................................................................... 33, 45

*In re Republic of Ecuador*,
   No. C–10–80225, 2010 WL 3702427 (N.D. Cal. Sept. 15, 2010) .................... 20

*In re Tesla Motors, Inc. Securities*,
   No. 3:13-CV-05216-CRB, 2015 WL 1306490 (N.D. Cal. Mar. 23, 2015) ....... 53

*In re WinNet R CJSC*,
   No. 16MC484 (DLC), 2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017)......... 21, 22

*Inv. Vehicles v. KPMG, L.L.P.*,
   798 F.3d 113 (2d Cir. 2015) .............................................................................. 45

*Jones v. Metro. Life Ins. Co.*,
   No. C–08–03971–JW (DMR), 2010 WL 4055928 (N.D. Cal. Oct. 15,
   2010) ............................................................................................................ 23, 49

*Legal Voice v. Stormans Inc.*,
   738 F.3d 1178 (9th Cir. 2013) ............................................................... 21, 28, 36

*Mount Hope Church v. Bash Back!*,
   705 F.3d 418 (9th Cir. 2012) ....................................................................... 28, 53

*Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*,
   256 F.R.D. 678 (C.D. Cal. 2009) ...................................................................... 33

*Rainsy v. Facebook, Inc.*,
   311 F. Supp. 3d 1101 (N.D. Cal. 2018)............................................................. 32

*Ready Transp., Inc. v. AAR Mfg., Inc.*,
   627 F.3d 402 (9th Cir. 2010)............................................................................. 23

*Sonnino v. Univ. of Kan. Hosp. Auth.*,
   No. 02-2576-KHV-DJW, 2004 WL 764085 (D. Kan. Apr. 8, 2004) ............... 33

JOINT STIPULATION RE FIRST IDEA'S
MOTION TO QUASH SUBPOENAS ISSUED
BY APPLICANT PATOKH CHODIEV

**TABLE OF AUTHORITIES**
(continued)

**Page**

**STATUTES**

28 U.S.C. § 1782 .................................................................................... passim

**RULES**

Cal. Rules of Prof. Cond. Rule 3.3 ........................................................... 21

Cal. Rules of Prof. Cond. Rule 3.3(d) ...................................................... 22

Fed. R. Civ. P. 11 .............................................................................. 21, 30

Fed. R. Civ. P. 11(b)(3) ........................................................................... 21

Fed. R. Civ. P. 26 .................................................................................... 33

Fed. R. Civ. P. 45 ...................................................................... 9, 21, 36, 37

Fed. R. Civ. P. 45(c)(1) ..................................................................... 28, 53

Fed. R. Civ. P. 45(d) ................................................................................ 36

Fed. R. Civ. P. 45(d)(1) ................................................................ 21, 27, 36

Fed. R. Civ. P. 45(d)(2)(B)(ii) ........................................................... 36, 53

Fed. R. Civ. P. 45(d)(3)(B)(i) ................................................................. 33

Fed. R. Evid. 408 .................................................................................... 18

JOINT STIPULATION RE FIRST IDEA'S
MOTION TO QUASH SUBPOENAS ISSUED
BY APPLICANT PATOKH CHODIEV

# I.     FIRST IDEA'S ARGUMENT

## A.     INTRODUCTION

The need for this motion is a regrettable exercise in irony: subpoenaed party First Idea International LTD ("First Idea") is forced to bring this motion to quash, or otherwise narrow the subpoena, and seek sanctions, to defend its reputation from the false accusations contained in Patokh Chodiev's ("Chodiev") *Ex Parte* Application for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782 ("Application"). While Chodiev claims documents from First Idea are necessary to clear his name against an "unsupported, inaccurate, misleading, and damaging" report published on World-Check (*see* Dkt. 1-1 at ECF p. 6:6), in the same breath, Chodiev has made numerous "unsupported, inaccurate, misleading, and damaging" statements against First Idea, an innocent third party to this dispute.

Imagine this scenario: First Idea, a strategic advisory boutique, is first approached by senior executives from Chodiev's company Eurasian Resources Group ("ERG") (of which Chodiev is a board member, [*see* Dkt. 1-1 at ECF p. 8:11-12]) in approximately May of 2018. ERG asks to be introduced to First Idea's high-profile business contacts in Saudi Arabia. First Idea facilitates numerous business discussions and transactions between ERG and Saudi Arabian contacts over the course of several years. In July of 2020, one Saudi Arabian contact asks First Idea to prepare a due diligence report on ERG, which First Idea does with full disclosure to ERG. To prepare the report, First Idea tests a number of due diligence background check services, including the World-Check database owned by Refinitiv Limited ("Refinitiv"). Critically, First Idea only tests World-Check ***at the recommendation of the CEO of ERG***. First Idea has a single videoconference with Refinitiv on July 31, 2020 to receive a demonstration of the World-Check product. First Idea decides not to subscribe to the service and prepares the due diligence report without using any information obtained from World-Check. The business discussions with ERG proceed, and First Idea's interactions with Refinitiv end.

Apparently, and unbeknownst to First Idea, during or shortly after this meeting, an employee at Refinitiv notices that publicly available information about Chodiev is not in the World-Check database and takes steps to add that information.

Years later, Chodiev – one of ERG's board members – seeks § 1782 subpoenas against First Idea, (i) wrongly accusing it of having engaged in a years-long campaign to pressure Refinitiv, a company with which First Idea had ***one product demo meeting at ERG's suggestion***, into publishing a negative report about him and (ii) creating the false impression that First Idea is the author of numerous redacted emails attached to support the Application.[1]

In his Application, Chodiev paints First Idea as an unrelated company and omits any information about First Idea's lengthy business relationship with his company ERG. While claiming Chodiev's plan is to sue Refinitiv, not First Idea, Chodiev nonetheless seeks broad categories of documents from First Idea, including all documents related to First Idea's numerous business dealings with ERG, that have *nothing to do with First Idea's limited contact with Refinitiv*. Relying on these misrepresentations, the Court grants the Application on an *ex parte* basis. The media picks up the decision and repeats Chodiev's false accusations, painting First Idea in the press as a company that would seek to harm the reputation of one of its own business partners. (Rim Decl. ¶ 2, Ex. A.)[2] First Idea, a *third party* to Chodiev's spat with Refinitiv, now has to contend with tangible harm to its business reputation and the expense of fighting unduly burdensome subpoenas, all for having attended one demo meeting for a database service it never even ended up using. This result is unconscionable and exploits the

---

[1] Counsel for Refinitiv has confirmed that emails attached as Ex. 11 to the Application, sent after First Idea's only meeting with Refinitiv, ***were not written by First Idea and were internal Refinitiv emails***. Chodiev knew this all along because this email was produced to him ***unredacted***. (Declaration of Naeun Rim ("Rim Decl.") ¶ 3, Ex. B at 14.)

[2] Available at https://gothamcity.fr/2023/01/10/le-milliardaire-patokh-chodiev-veut-savoir-qui-a-sali-sa-reputation/.

United States discovery process. 28 U.S.C. § 1782 was not intended as a tool for foreign litigants to engage in massive fishing expeditions against third parties based on speculative theories unsupported by evidence.

For the last three months, First Idea has bent over backwards to try to resolve this dispute out of Court. Among other things, First Idea offered to produce all communications with Refinitiv (and indeed has already provided most of those communications) in exchange for a stipulation to clarify or retract Chodiev's false allegations. In response to these efforts, Chodiev only forced First Idea to rack up attorneys' fees by repeatedly asking for more specifics to each proposal. After months of delay, Chodiev ultimately would agree only to *consider* issuing a clarifying statement *after* First Idea fully complied with the subpoenas. Chodiev never had any intention of reaching a workable solution that would address both parties' concerns. In the months that have passed since the Application, Chodiev has not provided any evidence that would explain or justify his aggressive assertions other than to make circular arguments and mischaracterize First Idea's statements.

Chodiev's refusal to correct the record to undo the damage he has caused leaves First Idea with no other recourse but to seek relief from the Court. Accordingly, First Idea moves this Court for an order (or a report and recommendation) quashing the subpoena, or alternatively, striking the portions of the subpoena containing unsupported statements.[3] To deter Chodiev from making reckless, defamatory statements in the future, First Idea seeks sanctions under the Court's inherent authority and Rule 45 for the attorney's fees incurred in defending against this subpoena. Separately, First Idea also moves for a protective order narrowing certain parts of the subpoenas because they are overbroad and impose undue burden. At minimum, First Idea asks that the Court require Chodiev to pay

---

[3] Attached as Ex. K to the Rim Declaration is the Application, with false allegations highlighted.

the attorneys' fees and costs that First Idea has and will continue to incur to comply with these overbroad demands.

**B.     STATEMENT OF FACTS**

**1.     First Idea and Its Founder Jonathan Gray.**

Jonathan Gray is a French-American entrepreneur and the son of well-renowned Holocaust survivor Martin Gray, the bestselling author of "For Those I Loved." (Declaration of Jonathan Gray ("Gray Decl.") ¶ 2.) As a well-respected entrepreneur who founded several companies from a young age, including those in France, the United Kingdom, the United States, and Saudi Arabia, Mr. Gray is known for his extensive network and quality of relationships with high-level individuals, including in Saudi Arabia. (*Id.*)

Given Mr. Gray's business experience and vast network, he established his own strategic advisory boutique, First Idea, with the mission to assist governments, institutions, and large corporations in designing action plans and strategic thinking in the context of their economic and social transformations. (*Id.* ¶ 3.) First Idea is headquartered in London and has numerous offices across the world. (*Id.*) First Idea prides itself on maintaining positive relationships with its business partners that are built on mutual integrity and trust. First Idea's reputation as being straightforward in business dealings is vital to its value and success as a company. (*Id.*) Throughout the years, Mr. Gray has introduced various individuals and companies to First Idea's network. (*Id.*) Mr. Gray has never been sued privately or professionally, and this is his first unfortunate litigation. (*Id.* ¶ 2.)

**2.     ERG Enlists First Idea's Help Cultivating Business Relationships with Prominent Figures in Saudi Arabia.**

In his Application, Chodiev *omits entirely* the critical context of First Idea's relationship with Chodiev's company ERG. ERG is "a leading diversified natural resources group" that "has a portfolio of production assets and development projects in 15 countries." (Dkt. 1-1 at ECF p. 8:12-14.) AM and BS are ERG's

respective Chairman and Chief Executive Officer.[4] Chodiev is an ERG board member. (*See* Dkt. 1-2 ¶ 3.) The relationship between First Idea and ERG began in May 2018, when AM, ERG's Chairman, asked to be introduced to Mr. Gray through a mutual friend. (Gray Decl. ¶ 4.) AM sought that meeting because he was aware that Mr. Gray's clientele included several influential members of the Saudi government. (*Id.*) Following several high-level discussions over the following months, AM persuaded Mr. Gray to introduce him to Mr. Gray's Saudi clients to discuss investment opportunities between the Kingdom and ERG. (*Id.*)

Once it became apparent that the interests of his Saudi clients and AM were aligned, Mr. Gray went through great efforts to support ERG's business interests with Saudi Arabia. (Gray Decl. ¶ 5.) Specifically, between May 2018 and November 2022, Mr. Gray and First Idea arranged and/or facilitated numerous meetings between ERG and high-profile Saudi officials and investors. (*Id.*) Because these meetings were attended by prominent Saudi individuals, it is unlikely that Chodiev would be unaware of them or of First Idea's involvement. These meetings and First Idea's efforts contributed to highly-publicized and successful collaborations between ERG and the Kingdom of Saudi Arabia, including those relating to the mining industry.[5]

---

[4] *See* Group at a Glance, ERG's Website, accessible at https://www.eurasianresources.lu/en/pages/group-at-a-glance/group-at-a-glance; *see also* Dkt. 1-2 ¶ 3 fn.1 (citing same website).

[5] *See, e.g.*, "High delegation of ERG supports Saudi Arabia for initiating a collaborative approach to future growth of mining industry. . ." ERG Press Release, Jan. 14, 2022, available at https://www.eurasianresources.lu/en/news/High%20delegation%20of%20ERG%20supports%20Saudi%20Arabia%20for%20initiating; "Eurasian Resources Group Enters the Kingdom of Saudi Arabia, Plans Long-Term Investment," Press Release, Jan. 25, 2023, available at https://www.eurasianresources.lu/en/news/Eurasian%20Resources%20Group%20enters%20the%20Kingdom%20of%20Saudi%20Arabia.

### 3. At ERG's Recommendation, First Idea Tries Refinitiv's World-Check Platform for a Due Diligence Report on ERG.

As part of a potential business transaction with ERG, a senior Saudi official requested in or around July 2020 that First Idea prepare a high-level due diligence report on AM based upon publicly available information. (Gray Decl. ¶ 6; Declaration of Louis Godfroi ("Godfroi Decl.") ¶ 2.) ERG and AM were made fully aware of this fact. (Gray Decl. ¶ 6.) To prepare this report, First Idea explored due-diligence services offered by three companies, Bureau van Dijk, LexisNexis, and Refinitiv. (Godfroi Decl. ¶ 3.) First Idea was not familiar with Refinitiv before this incident and only got the idea to try out World-Check **based on the recommendation of ERG's CEO, BS**. (*Id.*; Gray Decl. ¶ 7.)

Because the World-Check platform did not provide trial accounts, a demonstrative videoconference was held on July 31, 2020 between Louis Godfroi, an employee of First Idea, and a World-Check salesperson. (Godfroi Decl. ¶ 4.) Mr. Gray was not part of the videoconference. (Gray Decl. ¶ 7.) During the call, Mr. Godfroi requested that the salesperson run some names through the database to test World-Check's software capabilities, including those of Mr. Gray and AM. (Godfroi Decl. ¶ 5.) Mr. Godfroi did not ask the salesperson to run the name of Chodiev—rather when the salesperson searched for AM's profile, the software provided a profile on ERG. (*Id.*) When the salesperson clicked on ERG's profile, the names of ERG's other owners appeared, including that of Chodiev. (*Id.*) Mr. Godfroi recalls that when the salesperson clicked on Chodiev's profile, the page appeared empty, unlike the profile for everyone else. (*Id.* ¶ 6.) Mr. Godfroi asked why Chodiev's profile was the only one that was empty. (*Id.*) The purpose of his question was to understand whether World-Check's product was working properly, not to learn why there was no negative information about Chodiev. (*Id.*) Of course, First Idea would have no incentive to try to smear the reputation of a board member

of a company with which it was trying to facilitate a business deal. That was the only mention of Chodiev that occurred during the call. (*Id.*)

At the end of this call, First Idea informed World-Check that it needed some time to think about subscribing given the cost of the service and the anticipated low usage. (Godfroi Decl. ¶ 7.) ***First Idea's communications with World-Check ended after this call***. (*Id.*) In the end, First Idea submitted a high-level due diligence report on AM to the Saudi officials on August 1, 2020. (*Id.* ¶ 8.) First Idea ***did not*** use any materials gathered from Refinitiv in the process of preparing the report. (*Id.*)

Without First Idea's knowledge or involvement, it appears that during or shortly after its meeting, a Refinitiv employee discovered publicly available information about Chodiev on Google that should have been included in his World-Check profile and took steps to update that information. (*See* Dkt. 1-2 ¶ 14, Ex. 11.)

### 4. Chodiev Files an *Ex Parte* Application Containing Defamatory Allegations Against First Idea, Which Is Published In the Media.

For at least the past two years, Chodiev has filed numerous 1782 applications enlisting the help of the U.S. court system to hunt down information related to the publishing of the World-Check report. In relation to this matter, Chodiev has sought subpoenas against Refinitiv US, LLC (Refinitiv's U.S. subsidiary), Thomson Reuters Holdings, Inc. (Refinitiv's affiliate), and RenCap Securities, Inc.[6]

On December 19, 2022, Chodiev filed his Application against First Idea with this Court. (*See* Dkt. 1–1-4.) In the Application, Chodiev claimed he was contemplating bringing legal proceedings against Refinitiv for publishing an "unsupported, inaccurate, misleading, and damaging report" based on various internet articles discussing investigations conducted on Chodiev in France and Belgium. (Dkt. 1-1 at ECF pp. 6:6; 10:1-14.) The Application ***conspicuously omitted*** all information about the scope of First Idea's relationship with ERG,

---

[6] *See* Case No. 21-mc-0423-AT (S.D.N.Y. 2021); Case No. 22-mc-00363-LAK (S.D.N.Y. 2022).

despite identifying Chodiev as an ERG board member and despite seeking *all documents related to ERG*, clearly indicating that Chodiev was aware that First Idea had a relationship with the company. (*Id.* at ECF p. 8:11-14.) While Chodiev insisted in the Application that his target was Refinitiv and that he did not intend to sue First Idea, (*Id.* at ECF p. 17), he justified the issuance of the subpoenas by claiming that First Idea aggressively, repeatedly, and improperly influenced Refinitiv into publishing negative information about him. Among other things, Chodiev claimed without proof that First Idea "***pushed aggressively*** for Mr. Chodiev's inclusion in World-Check" (*id.* at ECF p. 7:8-9), made "***repeated inquiries and prodd[ed]"*** World-Check into publishing a harmful report (*id.* at ECF p. 7:5-7), improperly "***influence[ed] World-Check to harm Mr. Chodiev's reputation***," (*id.* at 7:9-10.) ***<u>All of these allegations are false and were not supported by evidence.</u>***

The Court may understandably have been misled into believing that Chodiev had proof of these false allegations. The Application was supported by two attorney declarations and 15 exhibits that included numerous emails dating back to as early as February 2018 (before First Idea had even encountered ERG) that were apparently produced by Refinitiv, giving the appearance of robust evidentiary support. (*See generally,* Dkt. 1-2–1-3.) But a closer look at the record reveals it was all smoke and mirrors. Not a single exhibit references or identifies First Idea. (*See* Dkt. 1-2 ¶¶ 13-14, Exs. 7-11.) Nor does Chodiev include a declaration stating that these emails have been attributed to First Idea—he could not do so because that is false. The *only evidence* connecting First Idea to World-Check is a single sentence in the Declaration of Robert Mockler, which states, "Refinitiv US LLC identified the party with which it communicated regarding Mr. Chodiev as a representative of First Idea International, Ltd." (Dkt. 1-3 ¶ 4.) This vague hearsay statement indicates only that Refinitiv and First Idea had a communication about Chodiev – a far cry from saying that First Idea was the sender of the emails or was aggressively looking

to hurt Chodiev's reputation. In fact, counsel for First Idea has since contacted counsel for Refinitiv and received confirmation that the July 31, 2020 emails attached as Exhibit 11 to the Application did not come from First Idea. (Rim Decl. ¶ 3, Ex. B at 14.) Moreover, the emails in Exhibit 11 were produced to Chodiev unredacted, meaning he *knew* First Idea was not the author of these emails at the time he filed his Application but nonetheless misled the Court into believing that to be the case. (*Id*.)

While Chodiev does not expressly state that First Idea is the author of the emails (which it is not), he strongly implies it by (i) alleging that "*repeated inquiries and prodding by First Idea . . . appears to have led Refinitiv to publish*" the purportedly inaccurate report, and (ii) describing the numerous emails in a section of his brief titled, "Refinitiv's Discovery Responses Point to First Idea as a Source of Further Information About Mr. Chodiev's Claim." (Dkt. 1-1 at ECF pp. 7:5-7; 11:4-12:17.) This was highly misleading and defamatory.[7] The emails are redacted so that the names of the third parties communicating with what appear to be Thomson Reuters customer services employees are hidden. Many of the third parties in these emails *do* appear to be aggressively requesting that various online articles pertaining to Chodiev be reviewed and included in World-Check. (Dkt. 1-2 ¶¶ 13-14, Exs. 8-11.) But **none** of those emails came from First Idea, and Chodiev either intentionally or recklessly created the false impression that that was the case.

After considering this evidence and Chodiev's "assert[ion] that First Idea urged Refinitiv to publish" "an unsupported, inaccurate, misleading, and damaging report on Mr. Chodiev," the Court granted the Application on January 5, 2023, stating in the Order that "Applicant asserts that First Idea urged Refinitiv to publish

---

[7] As the Court is aware, statements do not have to be express to be defamatory, they may also be implied. *See Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980) ("To constitute a libel it is not necessary that there be a direct and specific allegation [o]f improper conduct. . . [but] [t]he charge may be either expressly stated or implied; and in the latter case ***the implication may be*** . . . ***apparent from the language used***").

this report." (*See* Dkt No. 7 at ECF p. 1:25-28 (the "Order").) Following the Court's Order, First Idea was contacted by the media, and an article was subsequently published in *Gotham City*, a Swiss investigative news publication that reports on white collar crime, repeating Chodiev's damaging and false accusations.[8] (Rim Decl. ¶ 2, Ex. A.) The article also assumed that First Idea authored the emails. (*Id.*)

### 5.    First Idea's Extensive Efforts to Resolve the Dispute.

Counsel for parties met and conferred telephonically on January 19 and 30, 2023. (Rim Decl. ¶ 4.) During these calls, counsel for First Idea explained to Chodiev's counsel why the Application was based on false, baseless, and inflammatory assertions. (*Id.*) Specifically, First Idea took issue with Chodiev's false allegation that "First Idea and its founder [Jonathan] Gray *pushed aggressively* for Mr. Chodiev's inclusion in World-Check," for which Chodiev had no evidence. (Dkt. 1-1 at ECF p. 7:8-9.)

These telephonic communications were followed by a meet and confer letter that First Idea sent to Chodiev on February 9, 2023. (Rim Decl. ¶ 5, Ex. C.) In that letter, First Idea (i) explained in detail how it was instrumental in establishing ERG's relationship with the Kingdom of Saudi Arabia, a material fact that was omitted from Chodiev's Application,[9] (ii) identified in specificity any and all interactions First Idea had with Refinitiv pertaining to the Application, and (iii) took issue with the false accusations that Chodiev's Application levied against First Idea without any credible evidence. (*Id.*) First Idea also took issue with the overbroad scope of the subpoenas, which would result in the disclosure of confidential trade secrets and communications related to the ongoing business transaction between First Idea, its Saudi clients, and ERG, that had nothing to do with Chodiev's dispute with Refinitiv. (*Id.*)

---

[8] https://gothamcity.fr/2023/01/10/le-milliardaire-patokh-chodiev-veut-savoir-qui-a-sali-sa-reputation/.

[9] Details of confidential business discussions have been redacted in the publicly filed version.

Notwithstanding these issues, First Idea also conveyed its willingness to ***voluntarily*** produce evidence relevant to Chodiev's Application with the condition that Chodiev (i) file a statement with the Court retracting the inflammatory assertions made against First Idea in the Application, and (ii) limit the scope of the sought discovery to afford First Idea protections covering its trade secrets and the confidentiality of its clients, especially relating to the past and ongoing business relationship between ERG and the Kingdom. (*Id.*)

Chodiev responded to First Idea's nine-page letter on February 13, 2023, claiming "the allegations made concerning First Idea in [the Application] were based on information received from Refinitiv regarding First Idea's contacts with Refinitiv" and that First Idea had "largely confirmed that information." (Rim Decl. ¶ 6, Ex. D at 69.) Of course, both Refinitiv and First Idea have only confirmed that the two had a single encounter to test the World-Check product during a due diligence inquiry into Chodiev's company ERG for a business deal First Idea was *helping ERG facilitate*. (Gray Decl. ¶¶ 6-7; Godfroi Decl. ¶¶ 3-7; Dkt. 1-3 ¶ 4.) Chodiev has provided ***no information*** to support his speculative belief that First Idea repeatedly and aggressively influenced World-Check to smear his reputation. Despite First Idea's efforts to identify and disclose all communications it had with Refinitiv, Chodiev insisted that "First Idea's conduct and the meeting with Refinitiv confirm[ed] that First Idea does indeed have information relevant to [Chodiev's] contemplated claims against Refinitiv." (Rim Decl. ¶ 6, Ex. D at 70.)

After the exchange of the February letters, counsel again conferred telephonically on February 15 and 23, 2023 without much progress. (*Id.* ¶ 7.) In response to counsel for Chodiev's claim that Chodiev might consider issuing a clarifying statement after receiving all subpoenaed documents, on February 24, 2023, First Idea sent the proposed terms of a detailed "sneak peek arrangement," whereby First Idea would first agree to produce all documents responsive to Request Nos. 4 and 5 and a modified version of No. 1 pursuant to a strict

confidentiality agreement.[10] (Rim Decl. ¶ 8, Ex. E.) Once Chodiev had an opportunity to review the documents and was satisfied he could retract his accusations, First Idea offered under the proposal to produce the documents outside of the confidentiality arrangement for Chodiev's use in relevant proceedings. (*Id.*)

On March 3, 2023, Chodiev sent another meet and confer letter to First Idea but did not respond in substance to the February 24 proposal. (Rim Decl. ¶ 9, Ex. F.) Instead, Chodiev demanded that First Idea expend more attorneys' fees proposing a clarification statement that Chodiev had not yet even agreed to make in principle. (*Id.*) Chodiev again maintained the position that "the [A]pplication assert[ed] accurate facts and reasonable arguments . . . ." (*Id.* at 75.) As purported additional "proof," Chodiev described statements from Refinitiv's counsel in the meet-and-confer letter but claimed it was attaching a copy of those statements under settlement privilege. (*Id.* at 76.) As of May 5, 2023, the date that First Idea's portion of this Joint Stipulation was served, counsel for Chodiev has still refused to clarify whether it intends to rely on the attached statements from Refinitiv's counsel, and if so, whether they remain under settlement privilege. (Rim Decl. ¶ 9.) Because Chodiev's counsel has not provided a response, First Idea will not address the substance of those communications in detail except to note that *nothing in those statements adds any support* for the false claim that First Idea repeatedly and aggressively campaigned Refinitiv to smear Chodiev. The statements from Refinitiv only *confirm* the benign and insignificant nature of the interactions, and also confirm they occurred only in 2020, meaning none of the redacted emails from prior years could have come from First Idea.

---

[10] Given that Federal Rule of Evidence 408 does not apply outside of the United States, First Idea proposed a liquidated damages clause to deter violation of the confidentiality agreement outside of the country. When counsel for Chodiev objected, First Idea indicated it was willing to consider a protective order, which was met with silence.

1     On March 8, 2023, First Idea responded to Chodiev's letter. First Idea again

2  reminded Chodiev that the vast majority of the allegations made in the Application

3  included "specific, harmful claims" that First Idea at no point made. (Rim Decl. ¶

4  10, Ex. G at 79.) First Idea reminded Chodiev about his obligation to disclose

5  "material facts to the Court rather than falsely insinuating that First Idea was an

6  unrelated company that had nefarious motives." (*Id.* at 80.) In this letter, First Idea

7  also proposed language for a stipulation that would retract the claims Chodiev had

8  falsely and unnecessarily levied against First Idea in his Application. (*Id.* at 82.)

9     Following its March 8, 2023 letter, First Idea followed up for more than a

10  month regarding its proposal and Chodiev's response. (Rim Decl. ¶ 11, Ex. H.)

11  Finally, the parties' counsel telephonically conferred on April 14 and 26, 2023 but

12  made no progress toward informally resolving the discovery dispute. (Rim Decl. ¶

13  12.) On April 26, 2023, First Idea attempted one last time to offer a resolution

14  outside of Court. (*Id.*) Ultimately, Chodiev rejected all of First Idea's proposed

15  terms and has refused to narrow the subpoenas. (*Id.*) Chodiev's counsel has claimed

16  Chodiev would *consider* filing a clarifying statement, but only after First Idea had

17  responded in full to the overbroad subpoenas. (*Id.*) Following the April 26, 2023

18  call, First Idea sent another letter explaining its position to Chodiev. (*Id.* ¶ 13, Ex.

19  I.)

20     On May 4, 2023, the day before First Idea was due to send over its portion of

21  the Joint Stipulation, counsel for Chodiev sent a letter agreeing for the first time to

22  a single modification of Document Request No. 1 but nothing else. (Rim Decl. ¶ 14,

23  Ex. J.) The letter falsely attributed a number of statements to First Idea, including

24  claiming that First Idea had admitted that it "raised the name of our client at least

25  twice" to Refinitiv (*Id.* at 137.) First Idea has never confirmed any facts regarding

26  its meeting with Refinitiv that are inconsistent with those set forth in this Joint

27  Stipulation, and Chodiev cannot now try to make up for his lack of evidence by

28  manufacturing statements from First Idea. More importantly, even if Chodiev's

counsel's mischaracterizations were correct, that would still not justify the notion that First Idea "aggressively" sought to smear Chodiev's reputation. Incredibly, the letter states, "[W]hether First Idea just pushed for the inclusion of Mr. Chodiev in the database or did so 'repeatedly' or 'aggressively'—our fair characterizations of the facts—is immaterial." (*Id.* at 139.). This is all but a concession that Chodiev's allegations had no basis and were not necessary—all while casually disregarding the real reputational harm done to First Idea. The harm to First Idea has been material, and it must be remedied.

C.   **ARGUMENT**

    1.   **The Court Should Quash the Subpoenas for Being Sought in Bad Faith, or Alternatively Use Its Inherent Authority to Strike the Unsupported Allegations from the Application.**

This case is before the Court based on an Application that was filed on an *ex parte* basis under 28 U.S.C. § 1782. Although *ex parte* requests are generally disfavored, § 1782 petitions are regularly reviewed *ex parte*, with the understanding that the "opposing party may still raise objections and exercise its due process rights by challenging the discovery after it is issued via a motion to quash, which mitigates concerns regarding any unfairness of granting the application *ex parte*." *In re: Ex Parte Application Varian Med. Sys. Int'l AG*, No. 16-MC-80048-MEJ, 2016 WL 1161568, at *2 (N.D. Cal., Mar. 24, 2016). Because the party objecting to the subpoena has no opportunity to oppose the *ex parte* application, his remedy is to move to quash the subpoena after-the-fact. *See, e.g.*, *In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976) (holding that the subpoenaed parties may raise objections and exercise their due process rights by bringing motions to quash the subpoenas); *In re Republic of Ecuador*, No. C–10–80225, 2010 WL 3702427, at *2 (N.D. Cal. Sept. 15, 2010) (permitting a 28 U.S.C. § 1782 application *ex parte*, and noting "such *ex parte* applications are typically justified by the fact that the parties will be given adequate notice of any discovery

taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it").

Courts have the authority to quash a subpoena for failure to meet the requirements under 28 U.S.C. § 1782, under Rule 45, when a party issues a subpoena in bad faith. *See Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013) (courts have authority under Rule 45(d)(1) to "impose sanctions when a party *issues a subpoena in bad faith*, for an improper purpose, or in a manner inconsistent with existing law") (emphasis added); *Green Dev. Corp. S.A. De C.V. v. Zamora*, No. 15-21594-MC, 2016 WL 2745844, at *3 (S.D. Fla. May 10, 2016) ("[A] district court should deny an Application under Section 1782 if it is 'made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials . . . in toto, just as it can if discovery was sought in bad faith in domestic litigation.'") (internal citations omitted); *In re WinNet R CJSC*, No. 16MC484 (DLC), 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017) ("[I]f a § 1782 application is made in bad faith, . . . the court is free to deny the application in toto"); *see also* Fed. R. Civ. P. 45(d)(1).

Courts have looked to Rule 11 and the rules of professional ethics to evaluate whether § 1782 subpoenas were sought in bad faith. *See Zamora*, 2016 WL 2745844, at *4-5 (looking to Rule 11 and the duty of candor for guidance on determining whether to quash an application for Section 1782 subpoena for bad faith because the applicant had failed to disclose that a different court had denied a related 1782 subpoena based on similar facts). Rule 11 requires that Section 1782 applications must not "omit facts critical to the application of the rule of law relied on." *Id.* at *4; *see also* Fed. R. Civ. P. 11(b)(3). Moreover, the California Rules of Professional Conduct mandate a duty of candor to the Court and prohibit applicants from "fail[ing] to correct a false statement of material fact or law previously made to the tribunal." Cal. Rules of Prof. Cond. Rule 3.3. This candor requirement is especially paramount in *ex parte* proceedings, where the opposing party has no

opportunity to respond or provide the Court with additional context. *In re WinNet R CJSC,* 2017 WL 1373918, at *9 ("the duty of candor is, if anything, more critical when *ex parte* applications are made to a court" in quashing a § 1782 application); *In re Dep't of Antioquia*, No. 16-CV-20335, 2016 WL 10707020, at *3 (S.D. Fla. June 9, 2016) ("By seeking [§ 1782] *ex parte* relief from the Court, Applicants had a duty of candor.") (internal citations omitted); *see also* Cal. Rules of Prof. Cond. Rule 3.3(d) ("In an ex parte proceeding where notice to the opposing party in the proceeding is not required or given and the opposing party is not present, a lawyer shall inform the tribunal of ***all material facts*** known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse to the position of the client.")

In his Application, Chodiev made two major misrepresentations to the Court that are grounds for quashing the subpoenas. *First*, he misguided the Court into believing that First Idea authored numerous emails to aggressively pressure World-Check into publishing a negative report, even though Chodiev had no evidence to support that. (Dkt. 1-1 at ECF pp. 7:5-7; 11:4-12:17.) *Second*, Chodiev also omitted all information about ERG's relationship with First Idea, with the latter being instrumental in ERG entering the Saudi market. These facts were material. Had Chodiev presented the facts as they were – that it only had evidence that First Idea had limited communications with Refinitiv in 2020 in which Chodiev's name may have come up in passing in the course of conducting due diligence on ERG, one of First Idea's long-running business partners – the Court might have questioned the necessity and scope of the subpoena, the relevance of the requested documents for a claim against Refinitiv, and the credibility of Chodiev's allegations. (Godfroi Decl. ¶¶ 5-6.)

For the reasons discussed below, the Court should quash the subpoenas issued pursuant to Chodiev's Application. At minimum, the Court should strike the defamatory language from the Application that has no bearing on the

communications First Idea had with Refinitiv. *See Jones v. Metro. Life Ins. Co.*, No. C–08–03971–JW (DMR), 2010 WL 4055928, at *6 (N.D. Cal. Oct. 15, 2010) (courts have the inherent power to "strike material from the docket, including portions of a document, reflecting procedural impropriety or lack of compliance with court rules or orders"); *see also Dews v. Kern Radiology Med. Grp., Inc.,* No. 1:12–cv–00242–AWI–MJS (PC), 2013 WL 1284110, at *1 (E.D. Cal. Mar. 28, 2013) ("Courts have the inherent power to control their docket and in the exercise of that power . . . they may properly strike documents." (citing *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404–05 (9th Cir. 2010).

a.   *Chodiev's Application contains false accusations that were made in bad faith because they lacked evidentiary support.*

Chodiev makes a myriad of unfounded, false and harmful accusations against First Idea. Specifically, he claims:

- "First Idea appears to have ***urged*** Refinitiv to publish" an "unsupported, inaccurate, misleading, and damaging report on Mr. Chodiev." (Dkt. 1-1 at ECF p. 6:6-8);

- "Refinitiv's discovery responses confirm that its publication process with respect to its negative report on Mr. Chodiev was not objective and that external influences were at play. Specifically, ***repeated inquiries and prodding*** by First Idea, a self-described 'strategic advisory boutique,' appears to have led Refinitiv to publish it." (Dkt. 1-1 at ECF p. 7:3-6);

- "It is unknown why First Idea and its founder Mr. Gray ***pushed aggressively*** for Mr. Chodiev's inclusion in World-Check. But First Idea's ability to influence World-Check to harm Mr. Chodiev's reputation raises serious concerns about . . . First Idea's actions. Information about First Idea's conduct—especially ***its motives for seeking to harm Mr. Chodiev's reputation***—cannot be obtained from any other source. Mr. Chodiev seeks further information on . . . the facts and

circumstances surrounding First Idea's communications that prompted publication of the Report." (Dkt. 1-1 at ECF p. 7:8-14);

- "Because its agents or employees communicated with Refinitiv about Mr. Chodiev, First Idea will **almost certainly** have information that sheds further light on the origins of the Report, Refinitiv's procedures for handling personal data, Refinitiv's basis for maintaining Mr. Chodiev's personal data, and its efforts—or lack thereof—to ensure the accuracy of the Report. Due to the nature of First Idea's political lobbying activities, **its intention in using Refinitiv's World-Check to harm Mr. Chodiev's reputation** is directly relevant to Mr. Chodiev's claims against Refinitiv for violations of the GDPR and DPA." (Dkt. 1-1 at ECF p. 12:9-14);

- Finally, under a heading stating that "Refinitiv's Discovery Responses Point to First Idea as a Source of Further Information About Mr. Chodiev's Claims," Chodiev describes a series of redacted emails as proof that various "third parties" had "**pressured** Refinitiv to publish a negative Report on Mr. Chodiev." (Dkt. 1-1 at ECF p. 11:10-12:6.) After describing these emails, Chodiev goes on to make the vague statement that "Refinitiv first identified First Idea as one of the entities that inquired why Mr. Chodiev was not included in World-Check and indicated that at least one teleconference was held between First Idea and Refinitiv."( Dkt. 1-1 at ECF p. 12:7-9.) The misleading inference Chodiev wants made is clear—he is strongly and falsely suggesting that First Idea was responsible for some of these redacted emails.

None of these accusations are supported by evidence. Chodiev included no proof that First Idea pressured Refinitiv about Chodiev or that they sent the attached emails—and in fact, discussions with counsel for Refinitiv have revealed that Chodiev received *unredacted copies* of many of these emails, meaning he was *aware* that they were not authored by First Idea when he filed the application. (Rim Decl. ¶ 3, Ex. B.) The only evidence Chodiev included in the Application that even mentions First Idea is **one sentence in an attorney declaration** – a vague, hearsay

attestation that "[o]n February 25, 2022, Refinitiv US LLC identified the party with which it communicated regarding Chodiev as a representative of [First Idea]." (Dkt. 1-3 ¶ 4.) This sentence ***does not and cannot support*** the laundry list of defamatory accusations that Chodiev has levied against First Idea. It is also telling how carefully worded and vague the sentence is. If Refinitiv had told Chodiev that First Idea had *aggressively* urged it to smear Chodiev and was the author of any of the redacted emails, the declaration would most certainly have said so. The fact that it does not demonstrates that Chodiev *had no such evidence*.

As it turns out, Chodiev's Application was not based on proof at all but on sheer speculation – he made the leap that First Idea's one meeting with Refinitiv meant that First Idea somehow was behind numerous emails sent to Refinitiv about Chodiev, many of which were sent before First Idea had ever encountered ERG. Section 1782 subpoenas cannot be based on speculation, and on that basis, the subpoenas against First Idea must be quashed. *See In re Oasis Focus Fund LP*, No. 3:22-MC-0112-BGS, 2022 WL 17669119, at *14 (S.D. Cal. Dec. 14, 2022) (granting motion to quash § 1782 subpoena containing "broad requests" that were "a bit speculative" and not "narrowly tailored" to even relate to "important issues" in the proceeding for which discovery was sought); *Zamora*, 2016 WL 2745844, at *7 (granting a motion to quash § 1782 application because applicant's claim that Zamora was "responsible for the [a]rticle's alleged distribution" was "nothing more than speculation"); *In re Abud Valech*, No. 20-MC-23408-WPD, 2021 WL 1062228, at *1 (S.D. Fla. Mar. 18, 2021) (denying §1782 application because it "appear[ed] to be a fishing expedition based on speculation").

Alternatively, the Court should strike the unsupported and defamatory accusations in the Application. For the Court's convenience, First Idea has attached a copy of Chodiev's Memorandum of Points and Authorities in support of the Application, and highlighted the false allegations that should be stricken. (Rim Decl. ¶ 15, Ex. K.)

b.   *The Application also omits material facts regarding the relationship between ERG and First Idea.*

In addition to the false accusations, Chodiev also omitted material facts that, if disclosed, would likely have impacted the Court's ruling. Throughout the sixteen pages of his Application, Chodiev ***not once*** mentioned the relationship that ERG, of which Chodiev is a board member, maintains with First Idea. (*See generally,* Dkt. 1-1.) Rather, Chodiev's Application identifies First Idea as simply "a lobbying company that is focused on implementing the programs . . . for the Saudi post-oil future" by "connect[ing] the Saudi Prince . . . to technicians, political connections, and banks." (Dkt. 1-1 at ECF p. 9:3-6.) From this description, one would think that ERG and First Idea had not crossed paths until First Idea took the allegedly "aggressive" actions to harm Chodiev.

The facts are to the contrary. First Idea has been fundamental in ERG's pursuit to establish its business relationship with the Kingdom of Saudi Arabia. (Gray Decl. ¶¶ 5, 8.) The extent of First Idea's involvement in cultivating the relationship between ERG and the Kingdom makes it unlikely that Chodiev was unaware of this fact. In fact, it is apparent that Chodiev must have had *some* knowledge of the relationship because he demanded as part of his subpoena all documents in First Idea's possession related to ERG – how would Chodiev have known that First Idea had any documents related to ERG at all unless he was aware of the relationship? Had Chodiev disclosed the scope of ERG's relationship with First Idea, the Court would have better understood the nonsensical nature of the discovery request. First Idea had little to no incentive to work tirelessly to build its relationship with ERG only to turn around and tarnish that relationship or the reputation of any of ERG's members.

Disclosing ERG's relationship with First Idea would have revealed the subpoenas for the wide-ranging fishing expedition that it is. For nearly four and a half years, First Idea facilitated various meetings between ERG and the Saudi

officials and investors and helped advance ERG's business agenda. (Gray Decl. ¶ 5.) Chodiev claims he is seeking a "narrowly tailored" subpoena against a third party he does not intend to sue, and yet he has requested *all documents related to ERG or himself* (of course, documents relating to ERG would also "relate" to Chodiev). (Dkt. 1-2 ¶ 17, Ex. 13 at ECF p. 69.) Such documents would span business communications that have gone on for nearly half a decade, and Chodiev has no explanation for how such a broad range of requests are necessary for his dispute with Refinitiv about a report. If the Court had known of the relationship between First Idea and ERG, it would have had the context to understand just how broad the requested subpoenas were. The omission was material and constitutes further grounds to quash.

### 2.   The Court Should Impose Sanctions by Awarding Attorneys' Fees to Deter Chodiev From Making Unsupported Damaging Assertions and Omissions in Court Filings in the Future.

Regrettably, First Idea also moves the Court to impose sanctions. Under Rule 45(d)(1), a party "issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1) The Court "must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." *Id.* Courts also have "the inherent power to punish conduct which abuses the judicial process," and "must exercise discretion in fashioning an appropriate sanction, which may range from dismissal of a lawsuit to an assessment of attorney's fees." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991). This includes when "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* "While it is preferable that courts utilize the range of federal rules and statutes dealing with misconduct and abuse of the judicial system, courts may rely upon their inherent powers to sanction bad faith conduct even where such statutes and rules are in place." *F.J. Hanshaw*

*Enterprises, Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136-37 (9th Cir. 2001).

"A court may . . . impose sanctions when a party issues a subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law." *Legal Voice*, 738 F.3d at 1185. "[S]anctions are justified when a party acts for an ***improper purpose***—even if the act consists of making a truthful statement or a non-frivolous argument or objection." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001). Although "bad faith is a sufficient ground for sanction, . . . it is not a *necessary* ground if Rule 45(c)(1) is otherwise violated in good faith." *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 428 (9th Cir. 2012).

First Idea has no choice but to seek sanctions against Chodiev. The baseless accusations set forth in the publicly filed Application have caused major reputational damage to First Idea. After the Court granted Chodiev's Application, an international white collar news publication, *Gotham City*, published an article on the parties' legal dispute. (Rim Decl. ¶ 2, Ex. A.) The article repeated Chodiev's inaccurate accusations claiming that "repeated requests for information and pressure exerted by First Idea, which [Chodiev] describes as a 'strategic advisory boutique,' seems to have incited Refinitiv to publish the report." (*Id.* at 6.) The article then stated, "The United States District Court of California **validated Patokh Chodiev's claim**," suggesting that the Court had adopted Chodiev's unfounded allegations by granting the Application. (*Id.* at 7.) Chodiev's Application thus not only misrepresented the correspondence that took place between First Idea and Refinitiv to the Court, it also distorted the facts for the public at large. Given the well-known relationship between First Idea and ERG, the article painted First Idea as a duplicitous business partner that would pretend to work with a company while simultaneously trying to smear its reputation

***For more than three months***, First Idea tirelessly tried to resolve this discovery dispute and sought the retraction of Chodiev's baseless accusations in the

Application in exchange for production of the documents actually relevant to Chodiev's issues with Refinitiv. The parties met and conferred telephonically on January 19, 2023, January 30, 2023, February 15, 2023, February 23, 2023, April 12, 2023, and April 26, 2023. (*Id.* ¶¶ 4, 7, 12.) The parties also exchanged numerous written meet-and-confer correspondence, including on February 9, 2023, February 13, 2023, February 24, 2023, March 3, 2023, March 8, 2023, and April 28, 2023. (*See id.* ¶¶ 5-6, Exs. C-D; 8-11, Exs. E-H; 13-14, Exs. I-J.) Chodiev rejected First Idea's extensive good-faith efforts to resolve this dispute at every turn. While First Idea provided ample information and evidence that its communications with Refinitiv were totally innocent, Chodiev did not provide a single document to demonstrate the reasonableness of his belief that First Idea somehow authored the various emails he claims it had. (Rim Decl. ¶¶ 5, Ex. C; 10, Ex. G; 13, Ex. I.) When Chodiev took the initial position that he could not agree to a retraction without first seeing the documents, First Idea offered to first produce the documents under a "sneak peek" confidentiality arrangement so that he could see the documents first before agreeing to that retraction. (*Id.* ¶ 8, Ex. E.) Having had no intention of ever agreeing to any such proposal, Chodiev asked First Idea's attorneys to spend hours detailing the specifics of the proposal and the proposed retraction. Chodiev then inexplicably rejected this proposal in its entirety. (*Id.* ¶ 12.)

Throughout the discussions, First Idea provided proof of First Idea's extensive relationship with ERG. (Rim Decl. ¶¶ 5, Ex. C; 10, Ex. G; 13, Ex. I.) First Idea also received information from Refinitiv confirming that Chodiev has an unredacted copy of the July 31, 2020 email attached as Exhibit 11 to his Application and is well aware that First Idea did not write that email (or any other). (*Id.* ¶ 3, Ex. B.) Despite these facts, Chodiev refused to retract or clarify the statements that have harmed First Idea or narrow the subpoenas appropriately.

First Idea does not deny that it held a demonstrative call with Refinitiv on July 31, 2020 to test the World-Check platform, and has nothing to hide with

respect to its communications with Refinitiv or any other service it used to conduct due diligence on ERG. (Godfroi Decl. ¶ 4.) But First Idea should not be required to comply with subpoenas that were obtained in bad faith and have defamed its reputation. The subpoenas should be quashed, and if Chodiev wishes to obtain another one that ***does not include the false accusations***, he is free to try to do so. In the meantime, he should be required to pay First Idea's attorney's fees for the cost of defending against this Application, which was sought in bad faith and which he refuses to correct.

As the Court well knows, it is likely that litigation privilege protects the defamatory statements made by Chodiev. In that circumstance, the only recourse may be to look to the power of the courts to impose sanctions and strike improper filings. *See Allstate Ins. Co. v. Tacoma Therapy, Inc.* (W.D. Wash., Apr. 16, 2014, No. 13-CV-05214-RBL), 2014 WL 1494100, at *4 (dismissing defamation claim on grounds that court "retains the power to impose sanctions for perjury or Rule 11 violations and can strike statements if necessary"). Because Chodiev's accusations were made within the context of a judicial proceeding, and he refuses to retract them despite not having any proof that they are true, First Idea has no other recourse other than to seek sanctions from the Court.

### 3. The Court Should Alternatively Grant a Protective Order That Significantly Limits the Scope of the Overbroad Subpoena Topics That Have Nothing to Do With Refinitiv.

The crux of Chodiev's Application is that "[i]n February 2022, Refinitiv . . . identified First Idea as one of the entities that inquired why Mr. Chodiev was not included in World-Check and indicated that at least one teleconference was held between First Idea and Refinitiv." (Dkt. 1-1 at ECF p.12:7-9.) However, the documents Chodiev has requested and his proposed matters for examination encompass far more than First Idea's communications with Refinitiv, which is the sole basis on which he has sought the subpoenas.

Specifically, Chodiev's subpoenas (i) are overboard and not narrowly tailored, (ii) seek information and documents without any scope as to time, and (iii) are beyond the scope and purpose of the issued subpoenas. Chodiev has requested the following categories of documents and examination topics:

| Document Requests | Matters for Examinations |
| --- | --- |
| 1. All documents mentioning or relating to Patokh Chodiev and/or his family. | 1. All information and data about Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests, including the source of that information. |
| 2. All documents mentioning or relating to the Eurasian Resources Group and/or any of its business interests. | |
| 3. All documents containing or reflecting communications between First Idea and any third parties regarding Patokh Chodiev Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests. | 2. All communications between First Idea and any third parties regarding Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests. |
| 4. All documents containing or reflecting communications between First Idea and Thomson Reuters, including all documents pertaining to First Idea's July 31, 2020 teleconference with World-Check, L'Echo publications, and Mediapart (Mediapart.fr) publications. | 3. All communications between First Idea and Thomson Reuters, including all documents pertaining to First Idea's July 31, 2020 teleconference with World- Check, L'Echo publications, and Mediapart (Mediapart.fr) publications. |
| 5. All documents containing or reflecting communications between First Idea and Refinitiv, including all documents pertaining to First Idea's July 31, 2020 teleconference with World-Check, L'Echo publications, and Mediapart (Mediapart.fr) | 4. All communications between First Idea and Refinitiv, including all documents pertaining to First Idea's July 31, 2020 teleconference with World- Check, L'Echo publications, and Mediapart (Mediapart.fr) publications. |
| | 5. Any work, instruction or |

| | |
|---|---|
| publications.<br><br>6. All documents containing or reflecting any engagement of or instruction to First Idea relating to Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests.<br><br>7. All documents containing or reflecting communications between First Idea and Renaissance Capital that pertain to Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests.<br><br>(Dkt. 1-2 ¶ 17, Ex. 13.) | engagement that First Idea has undertaken that pertains to Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests.<br><br>6. All communications between First Idea and Renaissance Capital that pertain to Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests.<br><br>(Dkt. 1-2 ¶ 18, Ex. 14.) |

Except for (i) Document Request Nos. 4 and 5, and (ii) Examination Topic Nos. 3 and 4, the remaining discovery Chodiev seeks is irrelevant for purposes of the lawsuit he intends to initiate in the United Kingdom against Refinitiv. The remaining requests are overbroad, not narrowly tailored, and not limited in time. They encompass nearly five years' worth of communications and dealings between First Idea, ERG, and prominent contacts in Saudi Arabia. Similar applications have either been rejected or narrowed in scope by the courts. *See, e.g., In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) (rejecting § 1782 application on the grounds that the document requests (1) were "not limited to documents or information connected to the [foreign] proceedings at issue," (2) "cover[ed] a span of five to eleven years," and (3) "include[d] documents that . . . contain[ed] confidential information"); *Rainsy v. Facebook, Inc.*, 311 F. Supp. 3d 1101, 1113 (N.D. Cal. 2018) ("no time period limiting the

documents or deposition topics makes the entire Application overbroad"); *In re Bernal*, No. 18-21951-MC, 2018 WL 6620085, at *9 (S.D. Fla. Dec. 18, 2018) (limiting the scope of document requests seeking "all communications relating to" a specific entity or individual because "[w]ithout any limitations, [the applicant] [would be] requesting every communication involving th[ose] entities or persons whether or not they are relevant to the underlying claims in the foreign proceeding."); *Sonnino v. Univ. of Kan. Hosp. Auth.*, No. 02-2576-KHV-DJW, 2004 WL 764085, at *5 (D. Kan. Apr. 8, 2004) (holding that request for production seeking "all documents that relate to or concern" a particular topic was "overly broad on its face")

The subpoenas also seek to uncover confidential communications First Idea may have had with its clients in the course of ongoing business transactions with ERG. Producing such information would not only uncover what First Idea's clients may have shared in confidence, but would also tarnish First Idea's reputation for discretion with its clients for any future transactions and the amount of information First Idea would be privy to. Fed. R. Civ. P. 45(d)(3)(B)(i) ("[t]o protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires disclosing a trade secret or other confidential research, development, or commercial information"); *Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*, 256 F.R.D. 678, 681 (C.D. Cal. 2009) ("The party opposing discovery must show that the information is a 'trade secret or other confidential research, development, or commercial information' under Rule 26, and that its disclosure would be harmful to the party's interest in the property.")

Accordingly, the Court should reject Mr. Chodiev's fishing expedition and protect the sensitive communications First Idea may have had with its clients. *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 563 (9th Cir. 2011) ("the district court should deny [a §1782 application] if the district court

1   suspects that the request is a fishing expedition or a vehicle for harassment.");

2   *Baxalta Inc. v. Genentech, Inc.*, No. 16-MC-80087-EDL, 2016 WL 11529803, at *8

3   (N.D. Cal. Aug. 9, 2016) (granting a motion to quash a subpoena obtained pursuant

4   to § 1782 because (i) the requested information was "far from narrowly tailored and

5   instead [sought] broad categories of confidential business information" and (ii) it

6   was "unclear whether [applicant] [could] adequately protect [the subpoenaed

7   party's] confidential information encompassed by the subpoenas . . . ."); *In re: Ex*

8   *Parte Application Varian Med. Sys. Int'l AG*, 2016 WL 1161568, at *5 ("[t]ypically,

9   requests become 'unduly intrusive and burdensome where they are not narrowly

10  tailored, request confidential information and appear to be a broad "fishing

11  expedition" for irrelevant information.'") (internal citations omitted).

12       Moreover, the subpoenas are unduly burdensome because they are

13  duplicative of the subpoenas Chodiev has already obtained from Refinitiv and

14  Thomson Reuters. Chodiev claims he is only contemplating proceedings against

15  Refinitiv for publishing information about him—but if Refinitiv is the only target, it

16  should be sufficient for Chodiev to obtain any relevant communications Refinitiv

17  had with third parties ***from Refinitiv***. Anything First Idea produces would either be

18  duplicative of documents Refinitiv has already produced or go outside the scope of

19  what Chodiev claims he is seeking. First Idea is a non-party to dispute—any

20  discovery requested of it should be narrowly tailored to the dispute in question, and

21  here, that should limit the scope to its communications with Refinitiv. Chodiev

22  cannot offer any explanation for why anything broader is necessary.

23       Notwithstanding these objections, First Idea has expressed – ***for months*** – its

24  willingness to produce documents responsive to Document Requests No. 4 and 5

25  and even to No. 1 if Chodiev agrees to limit the scope to "documents *mentioning* . .

26  . Patokh Chodiev and/or his family." (Rim Decl. ¶¶ 4-5, Ex. C; 7-8, Ex. E.) The

27  parties now appear to be in agreement regarding Document Request Nos. 1, 4 and

28  5. (Rim Decl. ¶ 14, Ex. J.) Moreover, First Idea has also confirmed to Chodiev that

1    it has no communications with L'Echo publications and Mediapart that would be

2    responsive to Document Request Nos. 4 and 5. (Rim Decl. ¶ 8, Ex. E.) Similarly,

3    First Idea also does not have any communications with Renaissance Capital that

4    would be responsive to Document Request No. 7. (*Id.*) To the extent the subpoenas

5    are not quashed, they should be significantly limited in scope to avoid the discovery

6    of any unrelated information not pertinent to Chodiev's contemplated litigation

7    against Refinitiv.

8        Throughout the meet-and-confer discussions, counsel for Chodiev has

9    repeatedly referenced an *ex parte* communication he had early on with Mr. Gray,

10   when Mr. Gray was *not* in the presence of counsel. Mr. Gray mistakenly believed at

11   the time that the Application was based on a gross misunderstanding and that

12   Chodiev would readily agree to a retraction after a reasonable discussion. (Gray

13   Decl. ¶ 9.) Mr. Gray even offered to open his office to a forensic team to prove that

14   First Idea had little to no communication with Refinitiv. (*Id.*) Of course, at the time,

15   Mr. Gray did not have the benefit of legal counsel to explain that Chodiev's

16   subpoenas were seeking far more extensive and intrusive documents than First

17   Idea's discussions with Refinitiv, and that it would be difficult to find a way to

18   require Chodiev to retract his false statements once the case was out of the Court's

19   jurisdiction. (*Id.*) It is bizarre that opposing counsel continues to rely on statements

20   made during these preliminary *ex parte* communications, knowing that Mr. Gray

21   was unrepresented. But in any event, the heart of Mr. Gray's original offer still

22   stands – if First Idea's communications with Refinitiv are all Chodiev wants, First

23   Idea continues to have no objection, so long as Chodiev retracts his false

24   statements.

25

26

27

28

Manatt, Phelps &
Phillips, LLP

JOINT STIPULATION RE FIRST IDEA'S
MOTION TO QUASH SUBPOENAS ISSUED
BY APPLICANT PATOKH CHODIEV

### 4. Should the Court Require Compliance With the Subpoenas, the Court Should Award First Idea Reasonable Attorneys' Fees and Costs For the Undue Burden of Such Compliance Under Rule 45.

"Rule 45(d) provides two related avenues by which a person subject to a subpoena may be protected from the costs of compliance: sanctions under Rule 45(d)(1) and cost-shifting under Rule 45(d)(2)(B)(ii)." *Legal Voice*, 738 F.3d at 1184. "When discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party. If so, the district court must order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder "non-significant." *Id.*

First Idea is an unrelated third party to the dispute between Chodiev and Refinitiv and "is not contemplated to be a party to the foreign proceeding." (Dkt. 1-1 at ECF p. 17:18-19.) What was supposed to be a painless demonstrative call with Refinitiv has resulted in (i) outlandish accusations against First Idea, by Chodiev, with almost no mechanism for holding him accountable, (ii) reputational harm for First Idea from Gotham City's published article. Requiring First Idea to comply with the full scope of the subpoenas Chodiev has issued will result in undue burden as First Idea would be forced to produce thousands of *native* documents, with metadata, pertaining not only to its contacts with Refinitiv, but any other information and communication it has related to Mr. Chodiev, his family, or ERG.

Given the sensitive nature of the information sought, First Idea would need to retain a third-party vendor to host these documents and undertake an extensive attorney review to protect the confidential nature of First Idea's trade secret documents, business information and privileged documents. This will clearly be a burdensome and expensive task to undertake. Consequently, Chodiev – not First Idea – should expend those fees to comply with the overly burdensome subpoenas.

### D.   **CONCLUSION**

After having spent years assisting ERG with its business interests and having had one inconsequential meeting with Refinitiv *at ERG's suggestion*, First Idea is baffled as to why an ERG board member is now questioning its motives for having had that meeting. The dispute in this case is not a mere disagreement about "characterizations"—the statements in the Application were false, had no evidentiary support, and were defamatory. For the aforementioned reasons, First Idea requests that the Court quash the subpoenas issued by Chodiev pursuant to his Application or, in the alternative, issue a protective order limiting the scope of the requested discovery to exclude Document Request Nos. 2, 3, 6, and 7, and Deposition Topics 1, 2, 5, and 6. Furthermore, First Idea also requests that the Court (i) strike the unfounded accusations in Chodiev's Application, and (ii) order Chodiev to bear the resulting attorneys' fees and costs associated defending or otherwise responding to this subpoena – but at minimum with the fees and costs associated with the review and production of the sought documents pursuant to Rule 45 of the Federal Rules of Civil Procedure as well as the Court's inherent power.

## II.   **CHODIEV'S ARGUMENT**

## I.   **INTRODUCTION**

Applicant Patokh Chodiev seeks information, as he is entitled to do, to support a foreign proceeding against Refinitiv for its inaccurate and unverified inclusion of him in World-Check.

Mr. Chodiev has no bone to pick with First Idea. However, it is irrefutable that on July 30, 2020, when First Idea says it met with Refinitiv and discussed Mr. Chodiev, World-Check did not have a profile on Mr. Chodiev, and that on August 17, 2020, just two and a half weeks later, World-Check published a negative profile on Mr. Chodiev. Refinitiv's counsel identified First Idea as "the entity whose inquiry to World-Check began the process that resulted in Mr. Chodiev's inclusion

in the World-Check database." The timing here is particularly important because the allegedly negative information about Mr. Chodiev was from press in 2018—more than two years before—about an investigation and ignores subsequent developments in that investigation. It is not clear why Refinitiv ignored that information for two years and then suddenly added a negative report immediately after interacting with First Idea. First Idea has relevant and crucial documents to show what occurred at First Idea's meeting with Refinitiv and why Refinitiv then quickly added the profile on Mr. Chodiev.

Rather than producing the documents sought to assist in Mr. Chodiev's contemplated proceedings against Refinitiv, First Idea asserts that the Court's order granting Section 1782 discovery should be reversed. It claims that some of the characterizations in the Application are "defamatory" and that Mr. Chodiev has acted in bad faith by not disclosing some alleged relationship between Mr. Chodiev's company ERG and First Idea. Neither assertion is accurate; nor does either provide any basis to revisit the Court's Order:

First, Refinitiv identified First Idea as the genesis for its including a profile on Mr. Chodiev. If First Idea has a dispute about that, it is a matter for First Idea to take up with Refinitiv directly. Mr. Chodiev simply made proper arguments based on the information as he understood the facts to be and included appropriate caveats for what he knew and didn't know.

Second, Mr. Chodiev does not recall ever even having heard of First Idea or Jonathan Gray until Refinitiv identified First Idea, so it is not surprising that there was no discussion of any relationship between ERG and First Idea in his Application. The notion that Mr. Chodiev somehow acted in bad faith by not disclosing something he didn't know is nonsense. Moreover, even if he did know, there was no possible benefit to failing to disclose that information since First Idea would obviously know what its own involvement was with ERG. Nor is any

1 relationship between ERG and the Saudis relevant except to the extent that it relates
2 to why there was a discussion about him with Refinitiv.

3 Mr. Chodiev has repeatedly endeavored to address First Idea's complaints,
4 but First Idea's response has been to hold its entire production hostage, insisting
5 that Mr. Chodiev first agree to a "retraction" dictated by First Idea. It is
6 disingenuous of First Idea to offer up the documents ordered to be produced subject
7 to the caveat that Mr. Chodiev cannot use any of them—after all, using the
8 documents in a foreign proceeding is the whole point of a 1782. Therefore, there
9 has been no genuine engagement by First Idea to propose a reasonable solution here
10 and avoid a Court-led process that is costly and time-consuming.

11 This Court should deny First Idea's motion, including its request for
12 sanctions.

13 **II.  FACTUAL BACKGROUND**

14 **A. Refinitiv Improperly Includes Mr. Chodiev in World-Check**

15 On August 17, 2020, Refinitiv published a false and defamatory profile on
16 Mr. Patokh Chodiev in Refinitiv's World-Check database. Inclusion in the World-
17 Check database is highly prejudicial because such a record carries an inference of a
18 due diligence "red flag" and cannot be "neutral." The short statement within the
19 Report explaining why Mr. Chodiev is included in the database intimates that he
20 has engaged in financial crimes. This negative inference is available to Refinitiv's
21 customers around the world, which include global banks, financial institutions,
22 professional services firms, and international agencies, and it is viewed as
23 authoritative on the risks of doing business with someone. As World-Check itself
24 states, "World-Check Risk Intelligence, used and trusted by the world's biggest
25 companies." (https://www.refinitiv.com/en/products/world-check-kyc-screening).
26 Refinitiv's actions have serious negative consequences for Mr. Chodiev as World-
27 Check is oft-used by banks, accounting firms, law firms, and, importantly, business
28 counterparties, to name just a few, for due diligence.

1    Knowing that there was no basis to profile him, Mr. Chodiev reached out to

2   Refinitiv to get his profile removed, but his efforts were fruitless. Since that time,

3   he has been working to determine what happened to cause such an improper profile

4   and to prepare to assert claims against Refinitiv to force its removal under the

5   Regulation (EU) 2016/679 (General Data Protection Regulation) ("GDPR") and

6   UK's Data Protection Act 2018 (c. 12) ("DPA").

7    Mr. Chodiev filed a Section 1782 application seeking discovery from

8   Refinitiv's U.S.-based affiliate (Refinitiv US LLC) in the Southern District of New

9   York, which the Court granted on July 30, 2021. Ultimately, following much time-

10   consuming negotiation, Refinitiv responded and explained that its decision to

11   publish the report on Mr. Chodiev stemmed from inquiries and representations by

12   Refinitiv's current and potential clients, including First Idea.

13    Specifically, Refinitiv's counsel sent a letter to Mr. Chodiev's counsel that

14   explained that "based on [their] investigation" it understands that "[i]n July 2020, a

15   member of the World-Check Sales team based in France arranged a teleconference"

16   with "First Idea after First Idea had indicated its interest in" World-Check though

17   "the World-Check website." (Declaration of Thomas Watson, ¶ 3, Ex. A). During

18   the teleconference, the Employee provided a demonstration of the World-Check

19   product" when, "[a]s is typical during such demonstrations, the representative of

20   First Idea was able to ask the Employee to run certain names through the database."

21   (*Id.* ) The employee "requested that Mr. Chodiev's name be run through the

22   database," but when "the result returned no hits, the First Idea representative

23   inquired why" he "was not included, given the adverse information concerning"

24   him which was publicly available." (*Id.*) Later, "the [e]mployee issued a ticket to

25   the World-Check Research team to ask if Mr. Chodiev should be included in the

26   World-Check database," and included a link to a google search for Mr. Chodiev."

27   (*Id.*) This was the trigger for Mr. Chodiev's inclusion in the World-Check database.

28   (*Id.*) In addition, Refinitiv provided Mr. Chodiev with certain correspondence with

third parties that appeared to push for the inclusion of Mr. Chodiev on World-Check.

### B. Mr. Chodiev Applies for Discovery from First Idea

As a result of Refinitiv's naming of First Idea, Mr. Chodiev filed the Application at issue here seeking to understand from First Idea what occurred that led to the publication of the negative profile on him. Prior to Refinitiv's doing so, to his recollection, Mr. Chodiev had never even heard of First Idea or Mr. Gray. (Declaration of Patokh Chodiev, ¶ 3.) So, it is not surprising that he didn't search for any contacts between ERG and First Idea or discuss them. Nor do they alter what Mr. Chodiev seeks here—the documents and testimony about what led to a discussion between First Idea and Refinitiv.

In support of his Application, Mr. Chodiev attached some of the correspondence—as originally provided to him in redacted form—to his Application to allow the Court to understand that there are significant concerns raised by what he has learned thus far, mainly that Refinitiv's process for inclusion is so slipshod that it is ripe for abuse. First Idea claims, wrongly, that these emails were somehow a fraud upon the court. (Mot. at 9). Nonsense. At no point in the Application did Mr. Chodiev say that the emails in question were written by First Idea (*see* ECF 1-1, 1-2), citing them to demonstrate that "third parties pressured Refinitiv to publish a negative [r]eport on Mr. Chodiev" and giving the example of the "Client Services 4" document which concerns "a customer" who was interested in Mr. Chodiev. (ECF 1-1 at 6). First Idea—discussed repeatedly in the Application by name—is not mentioned in this discussion. (*Id*. at 6-7), and the Application makes clear that Refinitiv "identified First Idea as *one of the entities* that inquired why Mr. Chodiev was not included in World-Check." (ECF 1-1 at. 7 (emphasis added)). Nor does the Maguire Declaration (ECF 1-2) that attaches these documents say or imply that the emails were authored by First Idea—it describes them merely as "documents Refinitiv produced on October 30, 2020." (ECF 1-2 at 4).

1    Further, the Application states its allegations in language making it clear they

2  are merely observations or arguments drawn from the available evidence, including

3  the timing of the profile's being published just two and a half weeks after the First

4  Idea-Refinitiv meeting. For example, the Application explains that "[i]t is *unknown*

5  why First Idea and its founder Mr. Gray" sought to include Mr. Chodiev in World-

6  Check. (ECF 1-1 at 2) (emphasis added). It says, the "report … that First Idea

7  *appears* to have urged Refinitiv to publish." (ECF 1-1 at 6) (emphasis added).

8  "Specifically, repeated inquiries and prodding by First Idea, a self-described

9  'strategic advisory boutique,' *appear[]* to have led Refinitiv to publish it." (ECF 1-

10  1 at 7) (emphasis added).

11                    **C. The Court Orders the Discovery from First Idea**

12    On January 5, 2023, this Court granted Mr. Chodiev's Application under

13  Section 1782. The Court held that Mr. Chodiev's Application fulfilled Section

14  1782's statutory requirements, *In re Ex Parte Application of Qualcomm Inc.*, 162 F.

15  Supp. 3d 1029, 1035 (N.D. Cal. 2016), First Idea could be said to be located in the

16  Central District of California, and the court agreed that the discovery was being

17  sought for the purpose of litigation against Refinitiv in a foreign jurisdiction. (ECF

18  7, at 3-5.) The Court properly considered the four discretionary factors, *Qualcomm*,

19  162 F. Supp. 3d at 1035, finding, *inter alia*, that the discovery being sought from

20  First idea, "particular facts and circumstances surrounding First Idea's

21  communications relating to the report in question—may not be readily obtained

22  from other sources." (ECF 7, at 5).

23    Despite First Idea's arguments to the contrary, there is no indication in the

24  Order that the Court either believed or relied on the misperception that the emails

25  attached to the Maguire declaration were written by First Idea. Indeed, the only

26  possible reference to these documents is the prosaic observation that "the

27  [a]pplication is supported by …two declarations." (ECF 7, at 1). Thus, it appears

28  that the Court focused on the core of the Application—that First Idea had

communications crucial to understanding why Refinitiv added Mr. Chodiev to World-Check.

### D. First Idea Refuses to Comply With the Subpoena

After learning of First Idea's involvement in the publication of the World-Check report, Mr. Gray contacted counsel for Mr. Chodiev directly to discuss the subpoena. (Declaration of Jonathan Gray, at ¶ 9). During the ensuing call, First Idea was willing to produce the requested documents and even offered to allow Mr. Chodiev to send a "forensics team" to one of First Idea's offices to gather the requested materials himself. (*Id.*)

First Idea then hired counsel, who immediately adopted a hostile approach. Counsel insisted that the Application "defamed" Mr. Gray and First Idea and demanded a "retraction."[11] In an attempt to resolve their differences, the parties held multiple phone calls and exchanged numerous, very detailed letters and emails (Rim Decl., Exs. C-J). First Idea refused to produce any documents for use in his contemplated foreign proceedings unless a "retraction" about First Idea's actions as stated in the Application was made. (*Id.* Ex. C). Mr. Chodiev's counsel responded that it would correct misstatements, if there were any, in the Application. (*Id.* Ex. D). But First Idea proposed language that included purported facts to which Mr. Chodiev could not aver. (*Id.* Ex. G). Moreover, First Idea proposed a process whereby Mr. Chodiev would get documents for internal review only but incur a $500,000 (!) penalty for any other use, such as the foreign proceeding that was the

---

[11] Following the Court's grant of Mr. Chodiev's 1782 application, a Swiss online review published an article that reported on some of the allegations in the Application. The January 10, 2023, article, entitled "Billionaire Patokh Chodiev wants to know who sullied his reputation," (Rim Decl., Ex. A), is based on the Application and Court Order. Although the Motion makes much ado about the article, the Motion does not say what is actually defamatory in it, and the article even includes a comment from Jonathan Gray to the effect that the Application was "the result of a 'grotesque error." (*Id.*). While any misunderstanding or mistranslation is unfortunate, Mr. Chodiev cannot be blamed for third party's website posting, no less a single post on a Swiss online review.

whole point of the Section 1782 Application in the first place, unless he agreed to issue a retraction acceptable to First Idea. (*Id.* Ex. E).

In response, Mr. Chodiev's counsel explained that he was "willing to meet and confer about the scope of [his] requests", offered ways to narrow the requests, and expressed his willingness to consider "any reasonable suggestion for resolving the matter, including procedures to protect confidentiality as appropriate." (*See, e.g., Id.*, Exs. D, F, H & J).

### III.   ARGUMENT

### A.   The Court Correctly Granted the Section 1782 Application

Despite First Idea's protestations, it has offered no basis for this Court to retract or alter its prior order. The facts that supported the Application continue to support the granting of Mr. Chodiev's Application. There are no new (or missing) material facts, and no new law. "When considering a Section 1782 application" a court must consider "three statutory requirements" to determine whether the application may be granted and "four factors" to determine whether it should. *In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1035 (N.D. Cal. 2016). The Court properly assessed each requirement and factor.

The three statutory factors are: (1) whether "the person from whom the discovery is sought … is found in the district" of the relevant district court, (2) whether the discovery is for use in a foreign proceeding, and (3) that the application be made by an "interested person." As this Court recognized, First Idea maintains an office in the Central District of California, satisfying the first requirement, *In re Ex Parte Applic. Of TPK Touch Sols. (Xiamen) Inc.*, Case No. 16-mc-80193-DMR, 2016 WL 6804600, at *2 (N.D. Cal. Nov. 17, 2016); Mr. Chodiev has demonstrated a "concrete basis," the retention of foreign counsel and sending of a demand letter, sufficient to show that "the contemplated proceeding is more than just a twinkle in counsel's eye," satisfying the second requirement. *See In re Hedrick House Ltd.*, Case No. SA MC20-00005-Doc (DFM), 2020 WL 3965999, at *2 (C.D. Cal. Mar.

31, 2020) (quoting *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123-124 (2d Cir. 2015)). And Mr. Chodiev is contemplated to be a plaintiff in the foreign proceedings, satisfying the third requirement.

Similarly, the four discretionary factors influencing whether a district court should grant an application under Section 1782 did, and still do, militate toward allowing Mr. Chodiev to take discovery here. Those factors are:

(i)    whether "the person from whom discovery is sought is a participant in the foreign proceeding";

(ii)   "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

(iii)  whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(iv)   whether the request is "unduly intrusive or burdensome."

*In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 563 (9th Cir. 2011) (quoting *Intel*, 542 U.S. at 264-65).

Here, each is satisfied:

First Idea is not contemplated to be a party to the foreign proceedings; English and European Union courts are receptive to the requested discovery; the Application does not circumvent affirmative proof gathering restrictions, and the Application is not unduly intrusive or burdensome.

Of these, the motion to quash only addresses a purported burden on First Idea with respect to producing documents, but there is no evidence as to what that burden is—nothing in the Rim, Gray or Godfroi declarations explains what that burden would be, and, in any event, Mr. Chodiev has offered, as set out below, to narrow his requests given the additional information provided by First Idea.

1

**B.**     **The Application Was Not Brought in "Bad Faith."**

Even crediting First Idea's comments about ERG and the Saudis, there is no basis for those comments to alter the Court's evaluation of the Application. Moreover, the arguments about which First Idea takes issue are supported by ample evidence. And, lastly, the only way First Idea could conclude that Mr. Chodiev misattributed emails to him is by misreading the 1782 Application.

**1.     Any Relationship Between ERG, First Idea and the Saudis Was Unknown to Mr. Chodiev and Is Irrelevant.**

First Idea appears to argue that Mr. Chodiev somehow concealed information about First Idea and ERG's purported relationship. But that's nonsensical. Again, Mr. Chodiev, to his recollection, had not heard of First Idea or Mr. Gray until Refinitiv identified them as the genesis of the negative profile on him. (Declaration of Patokh Chodiev, ¶ 3). Had there been a relationship as First Idea suggests, it would have made no sense to try to hide it as First Idea would know of such information. Nor is there any reason to see the requests as a "fishing expedition" as First Idea claims. The idea that this Application was brought as a stealth effort to learn stale information about ERG and the Saudis is absurd and fantastical.

Mr. Chodiev did include requests for information related to ERG because Refinitiv cited his association with ERG as a basis for his inclusion in World-Check and because his profile is linked to it. Indeed, First Idea acknowledges that linkage. (Godfroi Decl., ¶¶ 5-6).

First Idea makes much of its relationship with Saudi Arabia and its supposed role in connecting ERG with Saudi officials and points to the documents attached to its letter of February 9, 2023, which purportedly demonstrate that First Idea was "instrumental in establishing ERG's relationship with the Kingdom Saudi Arabia," (Mot. at 10). But the documents First Idea cites just show that ERG participated in conferences in Saudi Arabia without any mention of First Idea, no less any robust business relationship.

As for the newly-made assertion that ERG's CEO prompted use of World-Check for due diligence on Mr. AM, even if it were true—and there is little reason to believe it to be—this too does not alter the need for the subpoena or the fact that First Idea has relevant information. (*See* Gray Decl. ¶¶ 6-7). ERG's CEO would not suggest taking an action to harm one of its directors, and, in any event, First Idea ultimately was working on behalf of "my Saudi clients" as Mr. Gray puts it, not ERG. (Gray Decl. ¶ 6).

Regardless of First Idea's insistence on its supposedly important role in such things, Mr. Chodiev has no desire to intrude upon First Idea's confidential business relationships through this Application and Mr. Chodiev has endeavored to propose narrowing of the subpoenas to get only the information needed and to avoid any of First Idea's proprietary business information. A proper protective order should be able to alleviate any legitimate concerns. However, because First Idea's statements and declaration make clear that Mr. Chodiev's role with ERG is part of what led to his listing with World-Check, Mr. Chodiev's document requests cannot be narrowed—as First Idea has proposed—to eliminate all reference to ERG. Mr. Chodiev's whole point is to find out what persons or entities, if any, influenced Refinitiv, and why. Thus, understanding First Idea's motivation is key here because it will show whether Refinitiv is influenced by powerful constituencies or simply for business reasons will add someone to World-Check upon request. In any event, First Idea's alleged relationship with the Saudis is beside the point. Nothing about it makes the documents sought not relevant.

### 2.   The Application Is Not "Defamatory"

First Idea argues that Mr. Chodiev's Section 1782 "defamed" First Idea. But First Idea has never identified any misstatement of fact. It studiously ignores Refinitiv's identifying First Idea as "the entity whose inquiry to World-Check began the process that resulted in Mr. Chodiev's inclusion in the World-Check database on August 17, 2020." First Idea points to what are, at worst,

1   characterizations of events and arguments thereon that even First Idea cannot deny

2   occurred. First Idea objects to the statement that says First Idea "aggressively"

3   pushed for Mr. Chodiev's inclusion in the World-Check database. Of course, as

4   Refinitiv explained, First Idea approached the curator of a list of those involved in

5   "money laundering, sanctions, terrorism financing, bribery and corruption, and

6   financial crime," asked them to look up Mr. Chodiev, and then questioned why he

7   wasn't included. "Aggressive" is a generous characterization.

8          First Idea next argues that Mr. Chodiev somehow falsely suggested that First

9   Idea was associated with the emails attached to the Application. It did no such

10  thing. Mr. Chodiev never attributed those emails to First Idea or even implied that

11  First Idea authored those emails. While denying writing the emails, First Idea

12  provides no answers as to whether First Idea may have been working in concert

13  with others who contacted Refinitiv about Mr. Chodiev. It is these types of

14  questions that Mr. Chodiev hoped would be answered by information obtained in

15  the Section 1782 Application.

16         Moreover, the language First Idea objects to is opinion and characterizations

17  based on Mr. Chodiev's reasonable inferences from Refinitiv's document

18  production and, its letter identifying First Idea, and the two and a half weeks

19  between the Refinitiv-First Idea meeting and the publication of the World-Check

20  profile on Mr. Chodiev. There is no other evidence from Refinitiv to explain why

21  the publication occurred. There is just First Idea. First Idea's agent or employee did

22  not stop at running the name through the database but asked why Mr. Chodiev was

23  not included in the database given adverse information concerning Mr. Chodiev

24  they had found on Google. Whether First Idea agrees with Chodiev's

25  characterization of First Idea's actions as "aggressive" or "repeated," First Idea

26  cannot deny that those interactions occurred and that it has information pertaining

27  to them, information that is relevant to Mr. Chodiev's contemplated proceedings

28  against Refinitiv.

### 3. There Is No Basis for the Motion to Strike.

First Idea argues that this court should strike the supposedly offending statements from the Section 1782 Application but the authority it cites does not support this proposition. For instance, First Idea cites to *Jones v. Metro. Life Ins Co.*, for the proposition that the Court should strike Chodiev's "defamatory" statements from his 1782. No. C-08-3971-JW, 2010 WL 4055928, at *7 (N.D. Cal. Oct. 15, 2010). But rather than authorizing a free-wheeling inquiry by the court into any sort of impropriety, that case holds that a court may strike materials that "reflect[] procedural impropriety or lack of compliance with court rules or orders." *Id*. First Idea claims that the statements are incorrect; it identifies no procedural impropriety or noncompliance with court rules or orders.

Similarly, *Dews v. Kern Radiology Med. Grp., Inc.,* involves a failure to comply with a clerical court rule requiring that only one case number be included on a filing. No. 1:12 -cv-00242-AWI-MJS, 2013 WL 1284110, at *1 (E.D. Cal. Mar. 28, 2013). The court used its inherent authority to strike the additional case number. *Id*. Here there is no allegation that of a failure to comply with an express rule of the court, nor of a clerical error as at issue in *Dews*. First Idea's authority simply does not support the argument it makes here.

### 4. First Idea's Shifting Version of Events Undermines Their Assertions.

There is an additional reason not to credit First Idea's arguments. Its description of the events surrounding the meeting with Refinitiv has shifted over the course of Mr. Chodiev's correspondence with them, including as to major points like who requested the search or why First Idea contacted Refinitiv in the first place.

On February 9, 2023, First Idea represented that it contacted Refinitiv because a senior Saudi official requested that First Idea prepare a high-level due diligence report on Mr. AM. (Rim Decl. Ex. C). Supposedly, "Mr. AM is fully

aware of this fact." (*Id.*) First Idea repeated this representation in its May 5, 2023, declaration of Jonathan Gray and that of his business assistant, Louis Godfroi. Yet, in its letter of April 28, 2023, First Idea stated that the Saudi Arabians "ask[ed] First Idea to prepare a due diligence report on ERG," not AM. (Rim Decl., Ex. I ) And, in this later version, that it was "ERG," (Mot. at 30), or "ERG's CEO, Benedikt Sobotka [who] suggested to me that First Idea try Refinitiv Limited's World-Check platform." (Declaration of Louis Godfroi ¶ 3). First Idea accuses Mr. Chodiev of defamation but it can't even decide what the facts are that Mr. Chodiev supposedly misstated.

First Idea's description of the details surrounding First Idea's demo call with Refinitiv are similarly ever-changing. Refinitiv's counsel explained that First Idea asked that Mr. Chodiev's name be run through the World-check database. (Watson Decl., Ex. A). First Idea seems to suggest a more passive role, saying that "any mention of Mr. Chodiev would have been in passing and of no consequence to First Idea," (Rim Decl., Ex. I). This obviously contradicts Refinitiv's description of events. But it is also at odds with First Idea's later assertion that it asked about Mr. Chodiev because his profile was "empty" when it was displayed with ERG's other owners who both had profiles on World-Check. (Godfroi Declaration ¶ 6). First Idea's lack of clarity about the key events that led to Mr. Chodiev's inclusion in the World-Check database only highlight the need for discovery here.

## C.   The Subpoena Topics Seek Relevant Information and Are Not Overbroad.

Mr. Chodiev has repeatedly sought to work with First Idea to explore ways to narrow the requests in a manner that would provide Mr. Chodiev with the evidence he needs without imposing an undue burden on First Idea. Mr. Chodiev's subpoena contains only seven individual requests, all of which are focused on the issues directly relevant to his contemplated litigation against Refinitiv. The parties appear

to agree on the appropriateness of document requests 1, 4 and 5, but the remaining document requests are equally appropriate.

Document Request No. 2 requests "all documents mentioning or relating to" ERG. If these documents relate to a relationship that First Idea purports to have with ERG, then they are directly relevant to First Idea's motive and intent in meeting with Refinitiv, as First Idea admits it did. The obvious relevance of these requests outweigh any purported burden or overbreadth, which First Idea has not even substantiated. As discussed herein, Mr. Chodiev has been willing to narrow this to seek only those documents that go to what led to the contact with Refinitiv and those related thereto.

For similar reasons, Document Request No. 3, which asks for "All documents containing or reflecting communications between First Idea and any third parties regarding Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests," (ECF 1-2, ¶ 17, Ex. 13), is directly relevant to Mr. Chodiev's claims—whether First Idea was communicating with third parties about ERG and Mr. Chodiev would shed light on First Idea's motivations and actions with respect to Mr. Chodiev, and thus inform Mr. Chodiev's case against Refinitiv.

Document Request 6 requests all documentation of First Idea being engaged by Mr. Chodiev's family or ERG. Such documents would serve to shed further light on the First Idea's relationship, or lack thereof, with ERG and provide further information on any motivation to have Mr. Chodiev included on World-Check. In addition, they would tend to provide further detail on Refinitiv's process behind publishing the report against Mr. Chodiev. This request is essential to Mr. Chodiev's foreign claims against Refinitiv to understand whether Refinitiv's publication of the report was affected by external influences. Since First Idea has repeatedly represented that it did not influence the publication, Document Request No. 6 should not be burdensome.

For similar reasons, Document Request No. 7—requesting "All documents containing or reflecting communications between First Idea and Renaissance Capital that pertain to Patokh Chodiev, Patokh Chodiev's family, Eurasian Resources Group, and/or any of Eurasian Resources Group's business interests," (ECF 1-2, ¶ 17, Ex. 13), is relevant. Understanding what external influences could have led to First Idea to request that Mr. Chodiev's name be run in World-Check is critical to Mr. Chodiev's contemplated proceedings and directly relevant to Mr. Chodiev's claims as it relates to whether First Idea was engaged with another third-party who also asked Refinitiv questions relating to Mr. Chodiev.

In sum, Mr. Chodiev's sole interest in First Idea derives from his discovery efforts with respect to Refinitiv. It bears repeating that his sole interest in First Idea is to understand the circumstances surrounding the placement of Mr. Chodiev's profile on World-Check. Mr. Chodiev has, on multiple occasions, expressed his willingness to narrow whole categories of responsive documents which First Idea claimed to be burdensome to produce. As has been explained, Mr. Chodiev has repeatedly offered to narrow his requests and to enter into an appropriate protective order.

### D. Sanctions Are Not Appropriate Here.

The Court should reject First Idea's request for sanctions. Courts may issue sanctions relating to a subpoena when "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 33 (1991). But First Idea has not demonstrated that Mr. Chodiev has acted in bad faith.

The statements in the 1782 Application about First Idea are rooted in the discovery productions made by Refinitiv. All claims were based on reasonable inferences and arguments drawn from the evidence available, and they are adequately supported. Similarly, First Idea alleges that Mr. Chodiev was acting for an improper purpose in seeking to bring the Application, but it has not established what that improper purpose might be. Mr. Chodiev has never taken any actions that

1  were not in support of his contemplated litigation against Refinitiv, had never heard

2  of First Idea prior the documents being produced by Refinitiv and has no motive

3  other than developing evidence for his case against that company.

4       Sanctions are not warranted when, as here, "counsels' representations to the

5  court were proper, nonfrivolous and factually supported." *See In re Tesla Motors,*

6  *Inc. Securities*, No. 3:13-CV-05216-CRB, 2015 WL 1306490, at *1 (N.D. Cal.

7  Mar. 23, 2015). While First Idea may disagree with Mr. Chodiev's inferences, they

8  are doubtlessly supported by the many documents and declarations that are offered

9  in support.

10      First Idea further argues that it is entitled to an award of fees and costs

11 pursuant to Fed. R. Civ. P. 45(d)(2)(B)(ii) on the basis that Mr. Chodiev's

12 subpoenas "impose[] significant expense on the non-party." (Mot. at 30). But "Rule

13 45(c)(1) cannot properly support a sanction where the cost of complying with the

14 subpoena is minimal and there is no showing that the subpoena was facially

15 defective or issued in bad faith." *Mount Hope Church v. Bash Back!*, 705 F.3d 418,

16 421 (9th Cir. 2012). In this instance, any significant expense is due to First Idea's

17 truculence alone. As discussed above, Mr. Chodiev's subpoena is narrow and no

18 more burdensome than absolutely necessary as they consist of seven precise

19 requests plus a deposition subpoena. Yet, despite First Idea's initially being willing

20 to grant Mr. Chodiev full access to the responsive files, (Gray Decl., ¶ 9), its

21 counsel has since frustrated every effort by Mr. Chodiev to obtain even a single

22 document, as counsel has refused one proposal after another, even as they are in

23 possession of documents responsive to Mr. Chodiev's requests. Now, rather than

24 turning over the documents as required, First Idea insists that any production will

25 be an expensive and time-consuming process necessitating a full-blown document

26 review program (Mot. at 30), but it provides no declaration substantiating any

27 actual burden or expense. Nor should Mr. Chodiev be forced to pay fees that were

28

incurred unnecessarily or that result solely from an overzealous defense of simple discovery.

## IV.    CONCLUSION.

For the foregoing reasons, Applicant Patokh Chodiev respectfully requests that the Court deny the motion to quash and order First Idea to respond to the subpoena and provide a witness or witnesses to be deposed.

Dated:    May 16, 2023                    MANATT, PHELPS & PHILLIPS, LLP


                                          By: */s/ Naeun Rim*
                                          Naeun Rim
                                          Kishan H. Barot
                                          Noro Mejlumyan
                                          Attorneys for
                                          First Idea International LTD


Dated:    May 16, 2023                    STEPTOE & JOHNSON LLP


                                          By: */s/ Thomas Watson*
                                          Thomas Watson
                                          Robert Mockler
                                          Alexander Avery
                                          Attorneys for Applicant
                                          Patokh Chodiev


## LOCAL RULE 5-4.3.4(a)(2)(i) CERTIFICATION

The filer of this document attests that all other signatories listed above on whose behalf this filing is submitted concur in the filing's content and have authorized the filing.

JOINT STIPULATION RE FIRST IDEA'S MOTION TO QUASH SUBPOENAS ISSUED BY APPLICANT PATOKH CHODIEV